[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 11 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 12 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 13 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 14 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 15 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 16 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 17 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 18 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 19 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 21 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 24 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 25 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 26 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 27 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 28 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 29 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 30 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 31 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 32 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 33 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 34 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 35 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 36 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 37 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 38 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 39 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 40 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 41 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 42 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 43 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 44 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 45 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 47 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 48 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 49 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 50 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 51 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 52 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 53 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 54 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 55 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 56 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 57 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 58 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 59 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 60 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 61 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 62 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 63 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 64 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 65 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 66 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 67 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 68 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 69 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 70 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 71 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 72 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 73 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 74 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 75 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 76 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 77 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 78 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 79 
This case comes before the court on a mandamus, directed by the supreme court to Newell, the auditor of the canal department, commanding him to draw his warrant as auditor, upon the treasurer of the state, for the payment of a draft for $110, made by one of the canal commissioners in favor of Shippey, a contractor to construct certain culverts on the Erie Canal, and endorsed by him to Phelps, the *Page 80 
relator. The draft was drawn for money due Shippey on a canal contract made in pursuance or under color of the act entitled "An act to provide for the completion of the Erie Canal enlargement and the Genesee Valley and Black River canals, passed July 10th, 1851." Two questions were raised on the argument in this court: First, Whether the contract was regularly approved by the canal board, in pursuance of the 12th section of the act aforesaid; and, secondly, Whether the act itself was constitutional. If the objection to the validity of the act is well grounded, it follows as a necessary consequence that the canal contract was made without authority; that the auditor was justified in refusing to pay the draft, and the judgment of the supreme court in directing a peremptory mandamus, was erroneous.
Having, after a careful examination of the case, come to the conclusion that the act is, in its main provisions, unconstitutional and void, it is unnecessary to decide whether the contract with Shippey was regularly approved and perfected. The decision of the second question disposes of the whole case.
The constitution, art. 7, sec. 1, appropriates and sets apart in each fiscal year, out of the nett revenues of the state canals, commencing on the first day of June, 1846, a certain sum as a sinking fund, to pay the interest and redeem the principal of that part of the state debt called the canal debt. The sum thus appropriated and set apart was $1,300,000 in each fiscal year, from the date above mentioned until the first day of June, 1855, and afterwards $1,700,000 until the canal debt should be fully paid; and the principal and interest of the sinking fund is to be sacredly applied to that purpose.
By section 2 it is ordained that, after complying with the provisions of the first section, there shall be appropriated and set apart out of the surplus revenues of the state canals in each fiscal year, commencing on the first day of June, 1846, a further sum as another sinking fund, to pay the interest and redeem the principal of that part of the state debt called the general fund debt. The sum thus appropriated and set apart by section 2, was $350,000 in each fiscal year, until a sufficient *Page 81 
sum had been raised in pursuance of the first section to pay the interest and extinguish the entire principal of the canal debt; and after that period, then the sum of $1,500,000 in each fiscal year, until the general fund debt should be wholly paid.
By section 3, it is ordained that after satisfying the requirements of the first and second sections above mentioned, "there shall be paid out of the surplus revenues of the canals to the treasury of the state, on or before the thirtieth day of September in each year, for the use and benefit of the general fund, such sum, not exceeding $200,000, as may be required to defray the necessary expenses of the state; and the remainder ofthe revenues of the said canals shall, in each fiscal year, beapplied in such manner as the legislature shall direct, to thecompletion of the Erie Canal enlargement and the Genesee Valleyand Black River canals, until the said canals shall becompleted."
The third section contains a further provision, that after the general fund debt shall be paid, or the canals shall be completed, then the sum of $672,500, or so much thereof as shall be necessary, may be annually appropriated to defray the expenses of the government.
The first objection to the validity of the act of the 10th of July, 1851, and the only objection which it would seem necessary to discuss, is this: That the act directs the borrowing upon interest of nine millions of dollars upon canal revenue certificates, payable out of the future surplus revenues after the completion of the canals; and further provides for the application of the whole sum to the completion of the canals within three years. This is repugnant to the mandate in the constitution that the remainder of the revenues of the canals shall, in each fiscal year, be applied to the completion of the canals until they shall be completed. And if the act should be carried into effect, it defeats and annuls another clause in the constitution above quoted, by which a power is given to the legislature to apply the remainders of the revenue to the general *Page 82 
expenses of the government immediately after the completion of the canals.
In the language of this constitutional mandate, there is no obscurity. We know what is meant by "the remainder of the revenues of the canals." It is the annual residue of their net income, after having set apart the sums pledged by the constitution for the specific purposes previously mentioned. This remainder has averaged for five years preceding the 30th September, 1837, more than $800,000 annually
The manner in which these remainders are to be applied is left by the constitution to the direction of the legislature, and so far as respects the manner of their application the power of the legislature is unlimited. They may apply each remainder as it accrues to such portion of the enlargement of the Erie Canal, or to the completion of either of the others, as they may deem expedient. They may divide it among the other three, or they may apply the whole to either one. They may direct the width, depth and shape of the trunk of the canals, and the dimensions and mode of constructing the locks. All this relates to the manner of applying the money, and it is therefore within the power conferred on the legislature.
But the manner in which the money is to be applied is one thing; and the time when the application is to be made is another and a different thing. The difference between the manner in which a thing is to be done, and the time when it is to be done, is obvious to the plainest understanding. The mechanic who mends a shoe comprehends it as readily as the contractor who constructs a canal, or the convention which frames a constitution. The distinction can not be reasoned down or even obscured by argument. It perpetually recurs to the mind, whatever attempt may be made to obliterate it. The principal may instruct his agent specifically and strictly as to the time when the agency is to be executed, while he leaves the manner in which it is be performed to the discretion of the agent; or he may give special directions to his agent as to the manner in which a work is to be done, while he leaves the time to the agent's discretion. But in either case it is the *Page 83 
agent's duty to obey the specific directions of his principal. A discretionary power may be conferred upon the agent as to the manner in which a duty is to be performed, while all discretion as to the time is withheld; and in such case, the mode or manner in which the duty is to be performed, is subordinate to, and must be in conformity with the time specifically directed. No discretionary authority with respect to the time when each remainder is to be applied to the work, is conferred upon the legislature. On the contrary, the time is fixed, the command is positive; and all discretion in that respect is withheld.
The remainder of the revenues "shall, in each fiscal year, be applied," c. The remainders are annual, separate and successive; and if the remainder be applied in each fiscal year, the application must also be annual, separate and successive. The constitution is disregarded if a year is suffered to pass without the application of a remainder to the purpose specified; and it is disobeyed if by intentional anticipation more remainders than one are applied in the same year. The words are "the remainder" (in the singular number) "shall in each fiscal year be applied;" thus requiring each remainder to be applied successively as it accrues. The direction is not that the remainder shall be applied in some or any fiscal year, but in each fiscal year; thus speaking of and treating each remainder as a separate fund, to be applied by itself in its own year. The language of the constitution by thus fixing the time when each remainder is to be applied, precludes both anticipation and delay. The application can not be intentionally accelerated or retarded without disobeying the command.
This has been said to be too narrow a construction of the clause in question. But the first maxim in the construction of instruments is, "that it is not allowed to interpret what has no need of interpretation. When an instrument is worded in clear and precise terms — when its meaning is evident, and leads to no absurd conclusion — there can be no reason for refusing to admit the meaning which the words naturally import. To go elsewhere in search of conjectures in order to restrict or extend it, is but to elude it. If this dangerous method be once admitted, *Page 84 
there will be no instrument which it will not render useless" (Vattel, book 2, ch. 17, § 263).
This meaning of the clause under consideration is undoubtedly too narrow to admit of the consolidation of the separate and successive remainders of the revenue, for a number of years, into one fund, for the purpose of applying the entire fund at once, or within three years, for the object to be accomplished. Before this can be done we must blot out the words "in each fiscal year," which fix the time when each remainder is to be applied. In the language of Mr. Justice Bronson, in The People v.Purdy (2 Hill, 32): "For one, I dare not venture on such a course. Written constitutions will soon come to be regarded as of little value if their injunctions may be thus lightly overlooked; and the experiment of setting a boundary to power will prove a failure. We are not at liberty to presume that the framers of the constitution, or the people who adopted it did not understand the force of language."
The direction contained in the constitution with respect to the time when the remainders of the canal revenues shall be applied to the enlargement and completion of the canals, is too clear and explicit to be disregarded, even if we were at a loss as to the motive and reason on which it was founded. But we are under no such embarrassment. The object and purpose of the convention can not be misunderstood. It was to prevent the contracting of debt for the completion of the canals; and to preclude any device or contrivance by which the state or its revenues should be subjected to the payment of interest on money borrowed, or revenues anticipated, for the completion of the canals. It is an undisputed historical fact, that for the last fourteen years at least, the state has been agitated by a great financial question in regard to the canals, and more especially in regard to the enlargement of the Erie Canal. This question was, whether the enlargement should be gradually carried on and completed by means of the surplus revenue of the canal, after satisfying the pledges to which it had been subjected, or whether it should be more speedily accomplished by means of money borrowed. In 1838, the policy of borrowing money *Page 85 
prevailed, and between that year and 1842 the canal debt was greatly increased.
In 1842 the financial condition of the state had become embarrassed; the means in the treasury were not sufficient to satisfy the demands upon it; money could no longer be borrowed at the ordinary rate of interest; and the credit of the state had become essentially impaired. The cost of the public works had greatly exceeded the estimates upon which they were undertaken. The revenues of some of them had fallen far short of public calculation: instead of contributing to the resources of the treasury they were a burthen upon it. From these and other causes, the policy of the government in relation to the means by which the public works were to be completed, underwent in that year a total and radical change. All further expenditure on the public works, then in progress of construction, was suspended by law. A direct tax was laid, and such further loans at an unusual rate of interest were authorized as were necessary for the purpose of putting the treasury in condition to pay the demands upon it as they should become due; and a portion of the surplus revenue of the canals was devoted to the formation of a sinking fund for the redemption of the canal debt (Laws of 1842, chap. 114).
The enlargement and completion of the canals remained in a state of suspension when the constitution of 1846 was framed. The same financial question was agitated and debated in the convention. The revenues of the Erie Canal had in the mean time greatly increased. Together with the direct tax laid in 1842, they were abundantly sufficient to have paid the interest on the public debt, and to have completed the public works, within a comparatively short period. But the policy of speedily extinguishing the public debt prevailed in the convention over that of a speedy enlargement and completion of the canals. This is manifest not only from the debates and proceedings of the convention, but from almost every section of the financial article in the constitution. It is shown by the large sums devoted to that purpose out of the canal revenues; by the restraints imposed upon borrowing; by the prohibition against the release *Page 86 
or compromise of demands against incorporated companies; by the application of all sums collected from such companies to the augmentation of the sinking fund of the public debt; by the prohibition against loaning the credit of the state; by the injunction that all money raised by borrowing shall be applied exclusively to the object specified in the act authorizing the debt, or to the repayment of that debt.
No language can be better adapted to the carrying out and enforcing of this policy in the completion of the canals than that which requires each remainder to be applied in its own fiscal year. This direction is incompatible with a sale of the future remainders for the purpose of applying them out of their proper time; and equally so with the plan of borrowing on the credit of the fund, and applying the avails in mass. And it is incompatible with the expenditure of any portion of the remainder for the payment of interest, except in the single case provided for in the tenth section of article seven, by which, if the appropriation should exceed the revenue, a loan not exceeding one million may be contracted for the purpose of meeting the deficit.
By far the strongest objection to the borrowing of money for public purposes, arises from the obligation to pay interest on the loan. The debts thus incurred have usually a long time to run; and the interest often amounts in the end to a greater sum than the principal. In this respect it makes no difference whether the debt is contracted on the general credit of the state, or on the credit of a fund belonging to the state. When the interest on the loan is raised by a tax, it comes from the pockets of the people individually. When it is paid out of a fund belonging to the people, it is paid out of their common purse. In respect to the profit and loss of the transaction, the objection is as great to the one mode of borrowing as to the other. The chief object of the restraint imposed by the 12th section of article seven of the constitution, upon the contracting of public debt, was to protect the people against the exhausting burthen of paying interest. The fifth section authorizes a loan upon the credit of the sinking funds to procure means to satisfy the *Page 87 
claims of the creditors of the state as they become payable, and this is the only authority for such a loan. The restraints imposed by the 12th section are in effect annulled, if the legislature may borrow without limit upon a pledge of the public property or the public revenue. The extent to which this may be carried, if tolerated in the present instance, renders the 12th section of the constitution nugatory and useless. The main design of the direction that the remainders should be annually applied, undoubtedly was to prevent the adoption of any scheme involving the payment of interest on the funds used in the completion of the canals.
It has been suggested that the remainders of the canal revenues can not be appropriated and applied during the fiscal year in which they accrue, because their amount can not be actually ascertained until the close of the year. If this were true, it would not, in the slightest degree, affect the question under consideration. It would prove nothing except that the year in which the remainder is ascertained, is the proper year for its application. The objection to the act of 1851 is, that it applies the revenues in mass, and not successively as required by the constitution; and if it be admitted that the year when the amount of the remainder is ascertained is the fiscal year to which the remainder belongs in respect to its application, the force of the objection remains undiminished.
But there is no impracticability nor indeed any difficulty in applying each remainder during the year in which it accrues. The revenue of previous years affords the basis of an estimate sufficiently accurate for the appropriation for the current or following year; and if there should be a deficit in the surplus revenue to meet any prudent engagement, made upon the faith of the appropriation, the deficiency may be supplied by a loan in pursuance of the 10th section of the 7th article of the constitution. This is understood to be in conformity with the practice of the government since the adoption of the constitution of 1846. Most of the appropriations in the United States government, and in this state, are made before the revenues out of which they are to be paid are actually collected. They are *Page 88 
based upon estimates which are founded on the revenue of previous years, and the estimate of the net canal revenues, after deducting the sums set apart for the sinking fund, is the estimate of the remainder. There is no more difficulty in the case, if it should ever happen, where the actual surplus revenue should exceed the estimate and appropriation. There would in such case be a failure on the part of the officers of the government to apply the revenue according to the literal requirement of the constitution, and the surplus on hand would remain to be disposed of by the legislature, whose duty it would be to apply it to the completion of the canals with the next year's revenue. Such a case under an intelligent and faithful administration of the government may always be avoided. The 3d and the 10th sections, taken together, made ample provisions for an appropriation which shall embrace the entire remainder. But if by the culpable omission of the legislature (a case not to be presumed), or by an erroneous, although honest estimate, the whole remainder should not be applied during the fiscal year in which it accrues, the error may be corrected by the legislature of the succeeding year in the same manner as if the appropriation should be entirely omitted when it ought to have been made. The supposed impracticability of applying the remainders annually according to the requirement of the constitution, is entirely imaginary.
The act of 1851 is also repugnant to the last clause of section 3, of article 7, of the constitution. By this clause it is ordained that "after the general fund debt shall be paid, or
the said canals shall be completed, then the sum of $672,500, or so much thereof as shall be necessary, may be annually appropriated to defray the expenses of the government." This power, conferred by the constitution upon the legislature, takes effect immediately upon the completion of the canals. It is a power to apply to the general expenses of the government, a part — a large part — of the subsequent remainders of the canal revenues which by the completion of the canals will be released from their pledge to that object. The power can not be exercised by the legislature until the revenue is released by the completion *Page 89 
of the canals, because until then there is nothing to appropriate. But by the act of 1851 (§ 3), it is enacted, that, "after the close of the fiscal year in 1854, or at such earliest period as the said enlargement and canals shall be declared bythe canal board to be completed; the whole of the said surplus revenues specified in the first section of this act [the canal revenue remainders], as the same shall be ascertained at the end of each fiscal year, shall constitute a separate fund for, and be applied to the payment of interest on the said canal revenue certificates so issued by the comptroller as the same shall fall due, and to the redemption of the said certificates as they shall become redeemable, or to the purchase of the said certificates as hereinafter provided." Thus the remainder of the canal revenues, which by the constitution might immediately upon the completion of the canals have been appropriated to defray the expenses of the government, are, by this act, pledged for a great number of years after the completion of the canals to the payment of the canal revenue certificates. The canal revenue certificates may be issued until the end of the third year after the passing of the act, and be made payable at any time within twenty-one years after their date. Thus the power which the constitution gives to the legislature is defeated, if the pledge contained in the act of 1851 is valid.
One answer to this objection to the validity of the act, as given upon the argument, was, that the canals are not to be regarded as completed until the canal revenue certificates shall have been paid. This is an extraordinary proposition; a proposition not only at variance with the plain import of the language of the constitution, but in direct contradiction of the act of 1851. It has always been understood that the canals will be completed when the work shall have been done, and so the act of 1851 regards it. But for the purpose of reconciling the act with the constitution, we are required to reject the plain meaning of the words used, and to understand them in a newly invented sense; in a sense in which they were never understood either by the convention of 1846, or by the legislature of 1851. We are required to say not only that the canals are *Page 90 
not completed when the work is done, but that they are not completed when the canal board, acting officially under the authority of the act, shall have declared them completed. We can not assent to the proposition contended for. It is untrue as a fact; and its untruth is apparent on the face of the constitution and on the face of the act in question. The act provides for the finishing of the whole work within three years. When that is done, it directs the canal board to declare the enlargement and canals to be completed; and then in entire disregard of the constitutional provision, which authorizes the future remainders, upon the happening of that event to be applied to defray the general expenses of the government, it directs them to be funded to pay the canal revenue certificates.
It was not contended on the argument, and it can not be successfully contended, that the legislature of 1851 could control or defeat the exercise of a power which the constitution confers on a future legislature. It was even admitted that the disposition which the act of 1851 makes of the remainders in advance beyond two years from the passing of the act, was inoperative except as a pledge of the remainders. The act purports, however, to give explicit directions for the funding of the remainders, and to make an absolute disposition of the fund.
But if it is to be regarded only as a valid pledge, it defeats the execution of the constitutional power as effectually as an absolute disposition of the fund, unless it be admitted that the legislature may rightfully violate lawful pledges made by its predecessors. The design of the constitution was, that the remainders, subsequent to the completion of the canals, should be left subject to the disposition of the legislature at and after their completion; and they can not therefore be disposed of nor pledged until that time arrives, without subverting that design.
It is true that, if the remainders are applied annually according to the constitutional requirement, the canals can not be completed as soon as the end of the fiscal year in 1854, according to the plan of the act of 1851; and the revenues will not, until after that time, be released and made applicable to the *Page 91 
general expenses of government. But this does not remove the objection that the act is repugnant to the constitution. To make it an answer to this objection, even upon the forced supposition that the canals are not completed until the certificates shall have been paid, it must be demonstrated to a certainty that by the completion of the canals according to the plan of the act of 1851, the canal revenue certificates will be paid off, and the revenues themselves be made applicable to general purposes, as soon as the canals would be completed by the more gradual process prescribed by the constitution. This is impossible. No human foresight or sagacity can authorize the assertion that the canal revenue certificates can be paid off or redeemed, according to the plan of the act, as soon as the remainders would finish the canals according to the plan of the constitution. Every probability is against such a supposition But it is unnecessary to enter into an estimate of probabilities. All that part of the people of this state who have a greater pecuniary interest in the early application of the canal revenues to the general expenses of the government, than in the early completion of the canals (and there are many such), will be defrauded of their constitutional rights, if by the operation of the act of 1851 the time when the canal revenues may be used for general purposes shall be deferred or delayed; and any plan or system, which by a departure from the plan of the constitution puts this right at hazard, is a wrong done to them and a violation of the constitution.
But the concluding part of the third section above quoted, is important in another point of view. It confirms the construction already given to the previous part of the same section, which directs the annual application of the remainders to the completion of the canals. The concluding clause shows that the completion of the canals and the release of the remainders from their application to that object, were events to happen at the same time. The release of the revenues was to be the immediate consequence of the completion of the canals. But this consequence can not follow unless the work is paid for as it progresses, by the annual application of the remainders as directed *Page 92 
by the previous clause; and without leaving a debt chargeable on the remainders after the work is done. The two clauses are adjusted to each other on the same plan of completing the work by means of the revenue, without debt or anticipation. And the latter clause demonstrates with entire certainty that the former is to be understood according to the exposition herein before given to it. Reading the two clauses in connection, it can not be doubted that the direction that "the remainder shall, in each fiscal year, be applied, c.," was cautiously framed for the purpose and with the design of precluding any scheme or device like that contained in the act in question. Without striking it out, or mutilating it by transposition (which was not contended for on the argument), there is no escape from the conclusion that the plan and provisions of the act of 1851 are repugnant to its direction and commandment.
The act in question is therefore invalid on the following grounds:
1. Because it is in disobedience of the command of the constitution, that the remainder of the canal revenues shall, in each fiscal year, be applied to the completion of the canals, until they shall be completed.
2. Because it applies a large portion of the revenues to the payment of interest on the loan which it authorizes; whereas the constitution requires the revenues to be directly and wholly applied to the work itself, as fast as they accrue, and therefore without the payment of interest on money borrowed, or revenue anticipated, unless upon a loan made in the case specified in section 10.
3. Because if the plan of the act is to be regarded as a loan on the pledge and credit of the revenues, and not on the general credit of the state, it is nevertheless forbidden by the spirit and intent of the 12th section of the 7th article, and is incompatible with the annual and direct application of the remainders required by the constitution. The remainders can not be made the basis of a loan, because, if applied as directed by the constitution, they can not be paid or pledged to the lender. *Page 93 
4. Because the act withholds the remainders of the canal revenues, after the completion of the canals, from being applied to the general expenses of the government, and defeats the power which the constitution vests in the legislature to devote them to that use upon the happening of the event specified by the constitution.
5. Because, if carried into effect, the act might, and in all probability would defer and postpone the application of these revenues to the general expenses of the government, beyond the time when the canals would have been completed by the successive application of the remainders.
I concur also in the opinion entertained by the majority of my brethren, that if this act should be carried into effect, it would impose an obligation upon the state to pay the canal revenue certificates in case the remainders pledged for that purpose should, by the course of future legislation, or from other causes, become insufficient.
There is no legal remedy to recover a debt against the state in favor of its own citizens. In general the state pays only by reason of its moral obligation. The fact that money borrowed under the authority of a statute is applied to the use of the state, creates of itself such an obligation as future legislatures would feel bound to respect. No one acquainted with the history of the legislation of this state can doubt that money borrowed under the act of 1851, if applied to the completion of the canals, would be repaid on the ground of this moral obligation, in case of a failure of the revenues. The provision contained in the 14th section of the act professing to limit the liability of the state, might give rise to objection and controversy; but sooner or later the claim would prevail, and could not be effectually resisted. It is, therefore, in this respect, an evasion if not a direct violation of the constitution.
The judgment of the supreme court should be reversed, and the application for a mandamus denied, with costs in the court below.