BOYLE and others, Appellants, vs. NORTHWESTERN MUTUAL RELIEF ASSOCIATION, Respondent.

*February 3 — February 23, 1897.*

*Benefit society: Life insurance: Warranty: Privileged communications.*

1. Where an applicant for membership in a benefit society in terms "covenants and warrants" that her answers to questions in her application are full, complete, and true, and that the truth of such application shall be the basis of her rights of membership, and upon the certificate there is an indorsement that it is "issued on the faith that the application made is complete and true and contains all her answers and statements, otherwise this certificate shall be void," the answers in such application are all warranties, and a false affirmative answer to the question "Are you now in sound health?" renders the certificate of insurance void, even though the assured believed when she made it that it was true.

2. Information acquired by a physician or surgeon in attending upon a patient in his professional capacity, and necessary to enable him to treat such patient, is privileged.   The object of the provision of sec. 4075, R. S., that no physician or surgeon shall be *compelled* to disclose such information, was to protect the patient, and, construing that section according to its spirit and intention, a physician can neither be *compelled* nor *allowed* to disclose such information in court without the consent of the patient.   NEWMAN, J., dissents.

Boyle and others vs. Northwestern Mutual Relief Association.

APPEAL from a judgment of the circuit court for La Fayette county: GEO. CLEMENTSON, Circuit Judge. *Reversed.*

This action was brought on a certificate of membership issued by the defendant to Bridget Boyle, April 16, 1892, for the benefit of the plaintiffs, in the sum of $1,000, on her application dated April 1, 1892. The assured died on the 27th of April, 1892. The complaint contained the usual allegations that the plaintiffs had presented proofs of such death and offered to surrender said policy, and that the assessment had been made and collected by the defendant to pay said loss, and that in consequence thereof the defendant was indebted to them in the sum of $1,000, for which they demanded judgment. The defendant, among other things, alleged in defense that in the application of the assured she was asked and answered the following questions, namely: " Q. Have you received medical treatment or consulted a physician in the past ten years? A. Yes. Q. And if so, in what years? A. In the year 1890. Q. What were the nature and facts of the sickness or disability? A. Change of life. Q. How long were you under medical treatment? A. Two months. Q. 16. Are you now *in sound health?* A. *Yes.*" That in and by the terms of said application and contract she had covenanted, agreed, and warranted that said answers were true, and particularly that she was on the 1st day of April, 1892, in sound health, whereas said covenants and warranties were false and untrue, and she was not then in sound health, as she well knew, and for other and different causes than "change of life;" that she was then suffering from *endocervicitis,* or inflammation of the uterus, and also from ulcers, abscesses, and inflammation of the fallopian tubes. At the trial the court ruled that the affirmative of the issue was on the defendant, and it produced in evidence the testimony of four physicians authorized to practice, and who had treated and prescribed for Mrs. Boyle, to prove the defense relied on, by information

they had received from her, and knowledge which they had severally acquired when they treated her as a patient, and for the purpose of enabling them to prescribe for her as such patient. The testimony of each of said physicians was objected to, in due season, on the ground that the information and knowledge thus acquired was privileged, and that they ought not to be allowed to disclose the same. The court overruled such objections and admitted the evidence, and the evidence tended to show that Mrs. Boyle was not, at the time she signed said application, in sound health. The testimony of one of said physicians was to the effect that he treated her in April, 1892, but had prescribed for her prior to that time in 1890 and 1891; that he made an examination of the assured on the 19th day of April, 1892, and found that she had a catarrhal difficulty of the uterus, and inflammation of the fallopian tubes, of a chronic and inflammatory character, and one of the tubes was stopped,— was sealed up at both ends; that he told her she was in a dangerous condition, and it might be necessary for an operation to save her, and she ought to be treated right along, and be very careful with herself; that he gave her medicine, and had never seen her since; that her difficulty was certainly of a chronic character, and it, in his judgment, had existed at least a year. The testimony tended to show that the disease was known as *endocervicitis.* The questions and answers in part first of the application for membership were, among others, as follows: "(15) Have you received medical treatment or consulted a physician in the past ten years? A. Yes. Q. If so, in what years? A. 1890. Q. What were the nature and facts of the sickness or disability? A. Change of life. Q. How long were you under medical treatment? A. Two months. (16) Are you now in sound health? A. Yes. I hereby certify that the foregoing answers and statements are written as made and understood by me. Dated April 1, 1892. Bridget Boyle." Also the following answers to ques-

tions put by the medical examiner in part second of the application: "(48) Are you now free from disease, nervous or muscular weakness? A. Yes. (49) When did you last consult a physician, and for what reason? A. About two years ago, 'change of life.'" At the foot of this examination is the following, signed by the insured: "I hereby covenant and warrant all the foregoing answers and statements, including those in part first, to be full, complete, and true, and that this written application, and the truth thereof, shall be the basis of my rights for membership in the *Northwestern Mutual Relief Association*. Also, that my certificate of membership shall be in the form prescribed, and shall contain the usual conditions and rules and regulations." Also, in the additional examination for females, the question, among others, "Have you ever had any disease of the breast, or any uterine disease or weakness," which was answered in the negative, and at the foot of such examination was the following: "I hereby declare that the above written answers are true, and agree that they shall be a part of the application, which is the basis of the contract for membership in the *Northwestern Mutual Relief Association*. Bridget Boyle." The conditions on the back of the policy relied on, among others, were as follows: "First. That this certificate is issued and delivered in consideration and on the faith that the application made by the within-named member is complete and true, and contains all his answers and statements; otherwise this certificate shall be null and void."

The case was submitted to the jury to find a special verdict, and answer the following questions, among others: "(1) Did Bridget Boyle, who was insured in the defendant company by policy No. 12,720, believe herself to be in sound health and free from disease on April 1, 1892, at the time she made and signed the application for said policy? A. Yes. (2) Was she in sound health and free from disease at that time? A. No. (4) Did she know when she made

Boyle and others vs. Northwestern Mutual Relief Association.

said application, or did she then have reason to believe, that she had any uterine disease or weakness, except such troubles as usually attend the 'change of life' in women, and which might be reasonably understood to be included in the term 'change of life'? A. No." The plaintiffs moved the court for judgment on the verdict, against the defendant, for $1,000 and costs, but the court denied the motion; and they also moved the court to set aside the verdict, and for a new trial, on the ground, among others, of the admission of improper evidence at the trial, and because the answer to the second question was not sustained by the evidence, and that there was not sufficient evidence to sustain the verdict. The court denied said motion, and entered judgment on the verdict, for the defendant, from which the plaintiffs appealed.

For the appellants there was a brief by *Calvert Spensley* and *Orton & Osborn*, and oral argument by *P. A. Orton* and *Mr. Spensley*. They argued, *inter alia*, that if there was a forfeiture the defendant had waived it by receiving and retaining the premium after knowledge of the falsity of the representation of the assured as to her health. *Erdman v. Mut. Ins. Co.* 44 Wis. 376; *Stylow v. Wis. O. F. M. L. Ins. Co.* 69 id. 224; *Ins. Co. v. Norton*, 96 U. S. 234. The term "good health," as used in the application and answer, means "apparent good health," and does not exclude the existence of latent, unknown defects. *Goucher v. N. W. Traveling Men's Asso.* 20 Fed. Rep. 596; *Conover v. Phœnix Ins. Co.* 3 Dillon, 226; May, Ins. § 295; *Grattan v. Metropolitan L. Ins. Co.* 92 N. Y. 276, 280; *Moulor v. Am. L. Ins. Co.* 111 U. S. 335, 343.

For the respondent there was a brief by *Wilson & Martin*, attorneys, and *F. E. Parkinson* and *B. W. Jones*, of counsel, and oral argument by *Mr. Jones*.

PINNEY, J.    1. The deceased, in her application for membership, in answer to the question, "Are you now in sound

health?" answered "Yes," and by the terms of her applica-
tion she "covenanted and warranted all the foregoing an-
swers and statements," including the one in question, "to be
full, complete, and true, and that this written application,
and the truth thereof, shall be the basis of my rights of
membership" in the defendant association; and on her cer-
tificate the condition was indorsed, that it was "issued and
delivered in consideration and on the faith that the applica-
tion" made by her "is complete and true, and contains all
her answers and statements; *otherwise this certificate shall
be void.*"   The jury found that the assured, Bridget Boyle,
believed herself to be in sound health and free from disease
at the time she made and signed her application, and that at
that time she was not in sound health and free from disease.
We think that the statement in her application and the con-
dition indorsed on her certificate constitute a warranty that
Mrs. Boyle was at the time in sound health, and was made
by the parties the basis of her rights of membership; that
it was a condition of the contract, and, if untrue, that her
certificate is null and void.   Whether she was in sound
health was a matter not presumptively, at least, within the
knowledge of the defendant; and it had a right to require,
as a condition of Mrs. Boyle's membership, that she should,
by express warranty, take all risk as to whether she was
then in sound health.   We have here, then, a warranty, as
distinguished from a representation; and a substantial breach
of the warranty, whether affirmative of some existing fact,
or promissory, material to the risk, will defeat the policy.

The distinction between a warranty and a representation
is familiar, and is stated in *Blumer v. Phœnix Ins. Co.* 45 Wis.
622; *Baumgart v. Modern Woodmen*, 85 Wis. 546.   A war-
ranty, it is held, "need not be material to the risk, for,
whether material or not, its falsity or untruthfulness will
bar the assured of any recovery on the contract, because the
warranty itself is an implied stipulation that the thing war-

ranted is material." Beach, Ins. § 459, and cases cited in note; *Jeffries v. Life Ins. Co.* 22 Wall. 54–56; *Dwight v. Germania L. Ins. Co.* 103 N. Y. 341. It is not important that the party making the warranty really believes in its entire truth; if it be false, it avoids the contract. *Clemans v. Supreme Assembly R. S. G. F.* 131 N. Y. 485. "Sound health," as used with reference to an application for life insurance, has been defined to mean a state of health free from any disease or ailment that affects the general soundness and healthfulness of the system seriously. The word "serious" is not generally used to signify dangerous, but rather to define a grave, important, or weighty trouble. May, Ins. § 295; *Brown v. Metropolitan L. Ins. Co.* 65 Mich. 306. The present case is not really distinguishable from *Baumgart v. Modern Woodmen, supra,* where a stipulation in an application for membership in a benefit society, stating that the applicant had never had a certain disease, was held to be a warranty, and that, as it was shown that he in fact had such disease, it was held to be a breach of the warranty, although he never knew it and his death resulted from other causes. The plaintiffs' counsel relied upon the case of *Knights of Pythias v. Rosenfeld,* 92 Tenn. 508, where the language used in the contract was regarded as a representation, and not a warranty, and such was the case of *Illinois Masons' B. Soc. v. Winthrop,* 85 Ill. 537. The case of *Plumb v. Penn Mut. L. Ins. Co.* (Mich.), 65 N. W. Rep. 611, was where the statement that the applicant was " of sound health " was considered a warranty, and it was held that it was a question for the jury whether the insured was in good health when the policy was delivered. The case of *Moulor v. Am. L. Ins. Co.* 111 U. S. 335, is distinguishable from the present case, and was decided on the ground that where the policy in question had been so framed as to leave room for construction, rendering it doubtful whether the parties intended the exact truth of the applicant's statements to be

a condition precedent to any binding contract, the court should lean against that construction which imposed upon the assured the obligations of a warranty, and that, in the absence of explicit stipulations requiring such an interpretation, it should not be inferred that the assured took the policy with the understanding that it should be void if at any time in the past he was, whether conscious of the fact or not, afflicted with the diseases, or any one of them, specified in the questions propounded by the company, and that such a construction of the contract should be avoided, unless clearly demanded by the established rules governing the interpretation of written instruments. That case does not hold that where, as in this case, a clear and explicit representation of then existing good health was made, the parties may not contract upon the faith of it, and make the truth of the statements a condition of the validity of the certificate, so that that question shall be at the risk of the assured. This we hold the parties did in this case, and their right to make such a contract cannot be denied. *Jeffries v. Life Ins. Co.* 22 Wall. 47; *Ætna L. Ins. Co. v. France,* 91 U. S. 510. In this case the statement in the application and in the certificate or policy, as will be seen, stated an express warranty. The evidence is quite sufficient to support the findings, and to warrant a verdict that Mrs. Boyle had a serious disease at the time she made her application, that had been of a chronic character for a year, though, as it is found, she was not conscious of the fact. For these reasons, therefore, judgment was rightly given in favor of the defendant, unless the evidence of the medical witnesses was improperly received.

2. The question as to the admissibility of the evidence of the physicians, against the objection of the beneficiaries of the certificate, claiming under Mrs. Boyle, the deceased, is not one free from difficulty. There can be no question but that the information they severally acquired, and which en-

abled them to give their testimony, was acquired in attending Mrs. Boyle as a patient, and that it was necessary to enable them to advise her and to prescribe for her as physicians. Was this information privileged, as to her, under R. S. sec. 4075, which provides that "no person duly authorized to practice physic or surgery shall be *compelled* to disclose any information which he may have acquired in attending any patient in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or to do any act for him as a surgeon"? By the common law, information thus obtained by a physician or surgeon was not privileged, but he was at liberty to disclose it, either in or out of court, whatever effect such disclosure would have upon the rights, reputation, or feelings of his patient. The contention in favor of the admissibility of the evidence is that the use of the word "compelled" in the section shows that the information thus acquired is not privileged from disclosure as to the patient, whom such a disclosure may most seriously affect, but is privileged only as to the physician or surgeon, and that he may, at his option, disclose it in court, when all the injurious details may be publicly elicited under oath, or he may refuse to do so, in which event only the information is to be privileged, so that its disclosure will not be "compelled." It is argued that this conclusion is strongly supported by secs. 4074 and 4076, in relation to a confession made to a clergyman or other minister, or in respect to communications made by a client to an attorney or counselor at law, or his advice given thereon, in the course of his professional employment. In the above cases the provision is that the clergyman, etc., or the attorney "shall not be *allowed* to disclose" such confession, communication, etc., not that either "shall not be *compelled* to disclose," etc.

Statutory provisions on the subject of privileged information thus acquired exist in very many, if not a majority, of

the states; but they are all, as far as we have been able to
discover, to the effect that the person acquiring the infor-
mation "shall not be *allowed* to disclose" it as a witness,
with the exception of the provision in respect to physicians
and surgeons in this state, which was adopted in the terri-
torial statute of 1839 (page 249, § 71), and has been in force
ever since (R. S. 1849, ch. 98, § 75; R. S. 1858, ch. 137, sec.
80). The statute of Arkansas, enacted about a year prior
to the territorial statute of 1839, from which it may have
been borrowed, is in substance in the same terms. It was
somewhat considered in *Collins v. Mack*, 31 Ark. 685, but
the decision has no decisive bearing. There was no pro-
vision in the statutes of 1839 or of 1849 or of 1858, in re-
spect to information or disclosures to clergymen or attor-
neys, but these were incorporated in the revision of 1878,
and it appears from the note of the revisers that sections
4074 and 4076, in respect to communications to clergymen
and to attorneys, were taken from sections 833 and 835 of the
New York Code of 1877; hence the diversity of phraseology
in the section in relation to physicians is much less significant,
having occurred from revision, than it otherwise would be.
Under statutes providing that a professional witness " shall
not be *allowed* to disclose" information so acquired, it has
been held in a great number of cases, and with entire uni-
formity so far as we have been able to discover, that the
privilege is that of the patient, client, etc., and the informa-
tion or disclosure cannot be given in evidence against him,
or persons claiming under him, unless waived. " After one
has gone to his grave, the living are not permitted to impair
his fame or disgrace his memory by dragging to light com-
munications and disclosures made under the seal of the stat-
ute." *Westover v. Ætna L. Ins. Co.* 99 N. Y. 56–60; *Grat-
tan v. Metropolitan L. Ins. Co.* 80 N. Y. 282; *Edington v.
Mut. L. Ins. Co.* 67 N. Y. 185. The disclosure by a physi-
cian of information acquired in his professional character,

in attending on a patient, where not made in the course of his professional duty, is a plain violation of professional propriety, but the law does not prohibit such disclosure in his general intercourse. The statute relates only to his giving testimony in court in relation to information thus acquired, and it should receive, we think, a liberal interpretation, in order to carry out its evident beneficial purposes. It provides that the physician shall not be *compelled* to disclose any information, etc., acquired in his confidential relations with his patient. For whose benefit was this provision intended? Clearly, for the benefit of the patient, whose interests, reputation, and sensibilities may be injured and grossly outraged by its disclosure. The fact that the physician acquired the information in order to prescribe for or treat the patient cannot affect the physician in the least degree unfavorably, nor that he should be compelled to disclose as a witness the information or knowledge thus acquired. The object of the section, therefore, was to protect the patient, to whom protection was so important, and not the physician, to whom it was quite unimportant, from the consequences of such disclosure, and shows that the provision that the physician shall not be *compelled* to make the disclosure as a witness renders the statement of the patient privileged as to him, and that this was within the intention of the makers of the statute clearly implied from its language, and that it should not be disclosed by the physician without his consent. In *U. S. v. Babbit*, 1 Black, 55, it was held that "What is implied in a statute, pleading, contract, or will is as much a part of it as what is expressed." *Board of Sup'rs of Wood Co. v. Lackawana I. & C. Co.* 93 U. S. 624; *Rogers v. Kneeland*, 10 Wend. 250. "And a thing within the intention of the makers of the statute is as much within the statute as if it were within the letter." *People ex rel. Atty. Gen. v. Utica Ins. Co.* 15 Johns. 379; *Indianapolis & St. L. R. Co. v. Horst*, 93 U. S. 300. In *Harrington v. Smith*, 28 Wis. 43, it

was held that "The true rule for the construction of statutes is to look to the whole and every part of the statute, and the apparent intention derived from the whole, to the subject matter, to the effects and consequences, and the reason and spirit of the law, and thus to ascertain the true meaning of the legislature, though the meaning so ascertained may sometimes conflict with the literal sense of the words." Within these rules, we think that it is a clear and justifiable inference from the section under consideration, and the cause and apparent necessity of making the statute, that the information of the physician, so acquired, is privileged as to the patient, and that the physician can neither be compelled nor allowed to disclose it, as a witness, against the will or without the consent of the patient. This interpretation gives the law the beneficial effect it was evidently designed to have, while by the literal meaning of its language it would be rendered of little or no practical effect. We think that the court erred in admitting the testimony of the physicians thus objected to.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for a new trial.

NEWMAN, J. The difficulty of construction which Mr. Justice PINNEY mentions does not appear until it is attempted to put upon the statute a meaning not found in its words. No person will assert that the words of sec. 4075, R. S., in their natural and grammatical sense, import what the majority of the court hold that the legislature intended to declare. The court have put into the statute a thought not found there. Something has been added which the words do not express, and which the legislature has not declared. The words "allowed" and "compelled" are not equivalents, but are words of radically different force and meaning. Ordinarily, the plain grammatical sense and meaning of the words of the statute is to be deemed the law de-

clared by it.  The purpose of the interpretation of a statute
is to find out what the legislature intended by·the words
used.  Where the words used are plain and unambiguous,
the thought which they express is the law.  The words of
this statute are plain and unambiguous.  They have but a
single meaning, and that is plain and incapable of being mis-
understood.  They plainly import, in their ordinary and
grammatical sense, that, while the physician may be per-
mitted to disclose information which he has obtained through
his professional relations to a patient, he shall not be com-
pelled to do so.  No other meaning can be legitimately drawn
from them.  This fundamental rule of interpretation is stated
by JOHNSON, J., in *Newell v. People ex rel. Phelps*, 7 N. Y.
9, 97, as follows:  " Whether we are considering an agree-
ment between parties, a statute, or a constitution, with a
view to its interpretation, the thing we are to seek is *the
thought which it expresses*.  To ascertain this, the first resort,
in all cases, is to the natural signification of the words em-
ployed, in the order and grammatical arrangement in which
the framers of the instrument have placed them.  If, thus
regarded, the words embody a definite meaning, which in-
volves no absurdity and no contradiction between different
parts of the same writing, then that meaning, apparent upon
the face of the instrument, is the one which, alone, we are
at liberty to say was intended to be conveyed.  In such a
case there is no room for construction.  That which the
words declare is the meaning of the instrument, and neither
courts nor legislatures have the right to add to or to take
away from that meaning."  This rule is quoted by Judge
Cooley in Cooley, Const. Lim. (6th ed.), 71.  It has often
been declared by this court (*Ogden v. Glidden*, 9 Wis. 46, 52;
*Battis v. Hamlin*, 22 Wis. 669; *Brightman v. Kirner*, 22
Wis. 54; *Mundt v. S. & F. du L. R. Co.* 31 Wis. 451, 457;
*Boland v. Gillett*, 44 Wis. 329; *Gowan v. Hanson*, 55 Wis.
341; *Gilbert v. Dutruit*, 91 Wis. 661; Suth. St. Const.

§§ 236–238, 258, 259), and is now, at least, elementary. As stated by Mr. Justice MARSHALL in *Gilbert v. Dutruit, supra,* quoting Vattel: "It is not allowable to interpret what has no need of interpretation. When the meaning is evident, and leads to no absurd conclusions, there can be no reason for refusing to admit the meaning which the words naturally present. To go elsewhere in search of conjecture in order to restrict or extend the act would be but an attempt to elude it. Such a method, if once admitted, would be exceedingly dangerous, for there would be no law, however definite and precise in its language, which might not, by interpretation, be rendered useless." The decision in this case is an entire departure from the rule. There is no evidence in the statute itself, or outside of it, or in the context, of a purpose variant from the obvious meaning of the words, but, on the contrary, rather, that the words were chosen with care and precision, to make the intent plain. This is always to be presumed, but the context, so to speak, and the history of this statute, re-enforce this presumption. This statute (sec. 4075) is found between two sections which are *in pari materia* with it,— the privilege of confessions to clergymen (sec. 4074), and the privilege of communications to attorneys at law (sec. 4076),— in both of which the declaration is that they "shall not be *allowed* to disclose," while this is that they "shall not be *compelled* to disclose." This section was adopted from New York in 1839. It is found in the Revised Statutes of that state of 1829, as sec. 73, p. 406. It was adopted here, with the change of but one word. The words of the New York statute were, "No physician . . . shall be allowed to disclose;" enacted here, "No physician . . . shall be compelled to disclose." The change is palpable, and the purpose evident. That the legislature did not intend to adopt the New York statute unchanged, is manifest. That it did not intend the statute, as adopted, to be of the same scope and effect as the New York statute, must be equally

manifest. Identity of effect can be produced only by a forced construction. Legitimate interpretation cannot produce it. The statute is interpreted as if it read: "No physician . . . shall be allowed to disclose . . . if the patient or his representatives object." Can it be asserted that nothing has been added to the statute by construction? No similar statute existed in Michigan previous to the separation. The New York statute was enacted *verbatim* there in 1846. This statute made an appreciable change and advance from the law as it was before its enactment. Before the enactment of this statute, at common law, there was no privilege to the knowledge of physicians, acquired through professional relations. They could be compelled to disclose their information. It was a distinct change and advance when they could no longer be *compelled* to disclose such information. Statutes which change the common law as it existed at the time of their passage are held to change the common law only so far as the clear intent of the language employed absolutely requires. *Fitzgerald v. Quann,* 109 N. Y. 441; *Tompkins v. Hunter,* 149 N. Y. 117; Suth. St. Const. §§ 139, 290, 400. "It is not to be presumed that the legislature intended to make any innovation upon the common law, further than the case absolutely required. The law rather infers that the act did *not* intend to make any alteration other than what is specified, and *besides* what has been plainly pronounced." *Farrall v. Shea,* 66 Wis. 561, 566. So it seems clear that that is as far as the legislature intended to go in that direction. It is, indeed, sometimes permissible to construe statutes contrary to the natural grammatical meaning of the words, to advance an evident intention; but it can never be permissible to construe words against, nor to add to, their natural meaning, in order to carry out some supposed policy of the legislature, or to conform it to the court's ideal. That is to legislate. *Gowan v. Hanson, supra.* It will hardly be denied that the statute

has been improved in the process of construction. Yet it is wiser to let the legislature make the statute law. It is better if the profession, at least, can recognize the law when it is read upon the statute page. This statute should be left as the legislature made it. The evidence was properly received. The physicians were not compelled to disclose. The judgment of the circuit court should be affirmed.