ROBERT AULD and Bertha Johanna McGaffney v. F. W. CATHRO, Laura M. Dana and Gertrude G. Dana.

(32 L.R.A.(N.S.) 71, 128 N. W. 1025.)

**Wills — Undue Influence — Jury — Submission of Issue.**

1. There is no evidence to establish the fact that the will in controversy was executed as a result of undue influence practised upon the testatrix, hence the ruling of the trial court was correct in refusing to submit such issue to the jury.

**Witnesses — Evidence — Privileged Communications — Testimony of Physician.**

2. The privilege of secrecy to all information acquired by a physician from a patient in attending the patient professionally, in a proceeding contesting the probate of an alleged will of decedent, the testimony and opinion of decedent's attending physician as to her mental capacity, based entirely on information derived from her statements or the physician's observations while treating her professionally and for the purpose of such treatment, were properly excluded.

**Trial — Jury — Reading of Testimony.**

3. The failure of the trial court to have the testimony of a witness read at the request of the jury, *held*, under the circumstances of the case at bar, not error.

**Wills — Instructions — Disposing Capacity.**

4. The charge of the court relating to the disposition a testator or testatrix can make of his or her property under the laws of this state correctly states the law.

**Evidence — Opinion of Nonexpert — Sanity.**

5. The rule is that a nonexpert will be allowed to express an opinion upon an issue of sanity only after he has testified to acts, conversations, or conduct which to some extent indicate sanity.

**Evidence — Opinion of Nonexpert — Insanity — Discretion of Court.**

6. In this class of cases the question of the competency of the witness to testify is one for the court, and is also a question lying within the sphere of judicial discretion; and the familiar rule that such discretion will not be reversed except in cases of abuse applies in the case of nonexperts as well as experts who are called to express opinions upon an issue of insanity.

Opinion filed September 24, 1910. Rehearing denied December 14, 1910.

Appeal from District Court, Bottineau county; *Honorable Chas. F. Templeton,* J.

Action by Robert Auld and Bertha Johanna McGaffney against F. W. Cathro, Laura M. Dana, and Gertrude G. Dana. From an order denying a motion for a new trial, contestants appeal.

Affirmed.

*Noble, Blood, & Adamson,* and *Ball, Watson, Young, & Lawrence,* of counsel, for appellants.

Undue influence is to be measured with regard to the mental and physical condition of the person influenced. Woerner, Am. Law of Administration, 48; Dunaway v. Smoot, 23 Ky. L. Rep. 2289, 67 S. W. 62; Juzan v. Toulmin, 9 Ala. 663, 44 Am. Dec. 448; Lingle v. Lingle, 121 Iowa, 133, 96 N. W. 708; Woodbury v. Woodbury, 141 Mass. 329, 55 Am. Rep. 479, 5 N. E. 275; Meyer v. Fishburn, 65 Neb. 626, 91 N. W. 534; 29 Am. & Eng. Enc. Law, p. 111 and cases there cited.

Unjust and unnatural disposition of property may be considered. Meier v. Butcher, 197 Mo. 68, 6 L.R.A.(N.S.) 202, 94 S. W. 883, 7 A. & E. Ann. Cas. 887; Gay v. Gillilan, 92 Mo. 250, 1 Am. St. Rep. 712, 5 S. W. 7; Elliott v. Welby, 13 Mo. App. 19; Tyner v. Varian, 97 Minn. 181, 106 N. W. 898; Rivard v. Rivard, 109 Mich. 98, 63 Am. St. Rep. 566, 66 N. W. 681; England v. Fawbush, 204 Ill. 384, 68 N. E. 526; Livering v. Russell, 30 Ky. L. Rep. 1185, 100 S. W. 840; Hoffman v. Hoffman, 192 Mass. 416, 78 N. E. 492; Re Wiltsey, 135 Iowa, 430, 109 N. W. 776; Fry v. Jones, 95 Ky. 148, 44 Am. St. Rep. 206, 24 S. W. 5; Farnsworth's Will, 62 Wis. 474, 22 N. W. 523; Trezevant v. Rains, 85 Tex. 329, 23 S. W. 890; Edgerly v. Edgerly, 73 N. H. 407, 62 Atl. 716.

If there is evidence for and against the validity of the will, case is for the jury. Re Arnold, 147 Cal. 583, 82 Pac. 252; Fry v. Jones, 95 Ky. 149, 44 Am. St. Rep. 206, 24 S. W. 6; Lischy v. Schrader, 104 Ky. 657, 47 S. W. 611; Disch v. Timm, 101 Wis. 179, 77 N. W. 196; Davis v. Dean, 66 Wis. 100, 26 N. W. 737; Cole v. Getzinger, 96 Wis. 559, 71 N. W. 75; Baker v. Baker, 102 Wis. 226, 78 N. W. 453; Re Derse, 103 Wis. 108, 79 N. W. 46; Re Wheeler, 5 Misc. 279, 25 N. Y. Supp. 314.

Privileged communication to a physician can be waived by the patient and those representing him. Olson v. Court of Honor, 100 Minn. 117, 8 L.R.A.(N.S.) 521, 117 Am. St. Rep. 676, 110 N. W.

374, 10 A. & E. Ann. Cas. 622; Winters v. Winters, 102 Iowa, 53, 63 Am. St. Rep. 428, 71 N. W. 184; Blackburn v. Crawford, 3 Wall. 175, 18 L. ed. 186; Thompson v. Ish, 99 Mo. 160, 17 Am. St. Rep. 555, 12 S. W. 510; Fraser v. Jennison, 42 Mich. 209, 3 N. W. 882; Scripps v. Foster, 41 Mich. 742, 3 N. W. 216.

*Weeks & Murphy* and *Geo. A. Bangs,* for respondent.

Mere suspicion, conjecture, or possibility that undue influence induced a will, or power, motive, and opportunity to exercise it, are insufficient. Ginter v. Ginter, 79 Kan. 721, 22 L.R.A.(N.S.) 1024, 101 Pac. 634; Re Shell, 28 Colo. 167, 53 L.R.A. 387, 89 Am. St. Rep. 181, 63 Pac. 413; Winn v. Grier, 217 Mo. 420, 117 S. W. 48; Lamb v. Lippincott, 115 Mich. 611, 73 N. W. 887; Re Nelson, 132 Cal. 182, 64 Pac. 294; Sheehan v. Kearney, 82 Miss. 688, 35 L.R.A. 102, 21 So. 41.

Sufficiency of the evidence to show mental capacity is one for the court. 1 Wharton & S. Med. Jur. § 96; Kempsey v. McGinniss, 21 Mich. 123; Leffingwell v. Bettinghouse, 151 Mich. 513, 115 N. W. 731.

The undue influence must destroy free agency. Myers v. Hauger, 98 Mo. 433, 11 S. W. 974; Doherty v. Gilmore, 136 Mo. 414, 37 S. W. 1127.

A privileged communication is personal with the patient, applies to testamentary matters, and cannot be waived by the heirs and personal representatives. Grattan v. Metropolitan L. Ins. Co. 80 N. Y. 296, 36 Am. Rep. 617; Westover v. Ætna L. Ins. Co. 99 N. Y. 56, 52 Am. Rep. 1, 1 N. E. 104; Renihan v. Dennin, 103 N. Y. 573, 57 Am. Rep. 770, 9 N. E. 320; Loder v. Whelpley, 111 N. Y. 239, 18 N. E. 874; Re Myer, 184 N. Y. 54, 76 N. E. 920, 6 A. & E. Ann. Cas. 26; Re Coleman, 111 N. Y. 220, 19 N. E. 71; Re Flint, 100 Cal. 391, 34 Pac. 863; Harrison v. Sutter Street R. Co. 116 Cal. 156, 47 Pac. 1019; Re Redfield, 116 Cal. 637, 48 Pac. 794; Re Nelson, 132 Cal. 182, 64 Pac. 294.

Witness may testify to sanity of a person, from general observations, without testifying to facts. 2 Jones, Ev. § 366; Lamb v. Lippincott, 115 Mich. 611, 73 N. W. 887; Re Hull, 117 Iowa, 738, 89 N. W. 979; Stutsman v. Sharpless, 125 Iowa, 335, 101 N. W. 105; Lucas v. McDonald, 126 Iowa, 678, 102 N. W. 532; State v. Hay-

den, 131 Iowa, 1, 107 N. W. 929; Heaston v. Krieg, 167 Ind. 101, 119 Am. St. Rep. 475, 77 N. E. 805; Proctor v. Pointer, 127 Ga. 134, 56 S. E. 111; Glover v. State, 129 Ga. 717, 59 S. E. 816.

Accuracy of observation and weight of opinion is for the jury. Higgins v. Nethery, 30 Wash. 239, 70 Pac. 489; Howard v. Carter, 71 Kan. 85, 80 Pac. 61; Lassas v. McCarty, 47 Or. 474, 84 Pac. 76.

CARMODY, J.   This litigation arose in the county court of Bottineau county, and involves the validity of the last will of one Mary Auld, deceased.   Plaintiffs and appellants, Robert Auld and Bertha Johanna McGaffney, were respectively the husband and sister of said deceased.   Defendant and respondent Cathro is the executor named in said last will.   Defendants Laura M. and Gertrude G. Dana are two of the legatees named in said will.   Respondent Cathro filed in such county court a petition praying for the probate of such will. Appellants filed written objections to admitting said will to probate, in which they allege, in substance, that the writing purporting to be the said will was pretended to be made and executed on the 18th day of March, 1905; that on the said 18th day of March, 1905, and long prior thereto, said Mary Auld, by reason of unsoundness of mind, insanity, mental weakness, and imbecility, has been wholly incapable of making and executing her last will and testament, or any codicil to any will or testament, or any writing in the nature of a last will and testament; that said paper or writing purporting to be the last will and testament of the said Mary Auld were obtained by fraud and undue influence exerted over and upon her, by said Cathro, H. C. Dana, and others, as follows:   That said Cathro, Dana, and others, by reason of the unsoundness of mind, mental weakness, and imbecility of the said Mary Auld, exercised over and upon the said Mary Auld undue influence in varied and divers ways, and represented to the said Mary Auld that it would be necessary for her to place her property in the hands of a third person, or some person other than any of her relatives or heirs, to prevent the said Robert Auld from obtaining said property for himself, and the said writing is not the last will and testament of the said Mary Auld, deceased; that the said Robert Auld and the said Mary Auld were married in the county of Cavalier and state of North Dakota, in August, 1892, and the said Mary Auld,

from the time of said marriage, always represented to Robert Auld, and he always supposed that they were lawfully married; that she was the wife of the said Robert Auld at the time of her death; that the said Mary Auld represented to him at the time of her marriage that her name was Mary Hitterdahl, but contestants now believe that her name was Mary Olson, and that at the time of her marriage with said Robert Auld she had a husband living, named N. K. Olson, from from whom she was not at the time of said marriage divorced; and that all of the real property named by the said Mary Auld in said purported last will and testament is property given to her by Robert Auld in consideration of love and affection, and for the reason and under the belief that the said Mary Auld was his wife.

In addition to these objections, Robert Auld filed another objection as follows: "That the said purported last will and testament of the said Mary Auld, deceased, was not signed, sealed, and declared by her to be her last will and testament and witnessed; that it was not executed by the said Mary Auld, deceased, as provided by the statutes of North Dakota."

Respondents, replying to said written objections, deny each and every allegation contained therein, except as admitted or qualified.

Deny that said Mary Auld, on the 18th day of March or at any time, was unsound of mind, insane, mentally weak or an imbecile, and allege that at all times prior to her death she was of sound mind, and possessed of sufficient mental capacity to make and execute her last will and testament.

Deny that the will was obtained by fraud or undue influence, and allege that said will was duly and legally signed, executed, and witnessed.

Deny that any of the property named in said will was given to Mary Auld by said Robert Auld.

The county court made findings of fact and conclusions of law sustaining the contentions of appellants, and found that the said Mary Auld at the time of her death had a sister, Bertha Johnanna McGaffney, and a husband, Robert Auld, who are the plaintiffs in this action.

An appeal from the order and decree denying the petition of F. W. Cathro, asking for admission to probate of said instrument, was taken to the district court of Bottineau county, where the will was al-

lowed by the jury. From an order denying their motion for a new trial, contestants appeal to this court.

In addition to the facts herein stated, the following are the facts necessary to a decision of this case: At the time of the marriage of testatrix with Robert Auld, she had a homestead of 160 acres of land in Rolette county, adjoining Bottineau county; also three horses, two cows, and a calf, and household goods. She afterwards traded her farm for city property in Bottineau. She and her husband, Robert Auld, did not get on very well together, and lived separately a considerable portion of their married life. At the time of her death, an action for divorce brought against testatrix by Robert Auld, in which issue had been joined, was pending. Appellant Robert Auld married within ten days after her death. Testatrix was quite eccentric, and lived largely alone. H. C. Dana, father of the two girls, had done testatrix some favors, which she appreciated. She had frequently advised with him during her life, and several times stated to him that she was going to will him her property, as she did not want her husband, Robert Auld, to have any of it, said her people had not treated her right, and she did not want them to have any of her property. Dana each time protested, saying he did not want anything to do with it. She finally told him that she would will the property to his two little girls. This was in January, 1905. Dana then said to her, "I don't suppose there is any use in making your will, you are not going to die." He never talked with her again about the will until after the first will, hereinafter mentioned, was made. On the 4th day of February, 1905, testatrix made a will in which she devised all her property to respondents Laura M. and Gertrude G. Dana. After making the will of date February 4th, 1905, and about the first part of March, her sister, appellant, came to live with her. Testatrix then informed Dana that appellant Bertha wanted testatrix to leave her, Bertha, something. Testatrix said it would be all right for her to leave Bertha something, and Dana said, "sure." On the 18th of March, 1905, she made another will in which she devised a house and lot in the city of Bottineau to appellant Bertha Johanna McGaffney, and the balance of her property equally to respondents Laura M. and Gertrude G. Dana. The will also contained the following provision: "I have knowingly and intentionally omitted from this, my

last will and testament, Robert Auld, and any and all relatives of mine not mentioned herein." The property disposed of by the will consisted of two houses, and about six lots in the city of Bottineau, and about $1,000 in money. In all of the value of about $5,000. Both the Dana girls were born in one of these houses. Testatrix said she thought it would be nice for them to have the house they were born in.

She died on the 29th day of March, 1905, and left surviving her, in addition to her husband, Robert Auld, and her sister, Bertha Johanna McGaffney, her mother and a sister, Mrs. Bergen, and two brothers living at Hitterdahl, Minnesota. She had been separated from them for a number of years. Appellant Bertha Johanna McGaffney lived with testatrix, and took care of her for about fifteen days before her death. Testatrix was suffering from tuberculosis, from which she finally died.

Appellants assign twenty-three errors, which are divided in the brief into five subdivisions, as follows:

1. The refusal of the court to submit the question of undue influence to the jury. The court instructed the jury that there was not sufficient evidence to establish that the alleged will in controversy was executed as the result of undue influence practised upon the said Mary Auld.

2. Rejecting the offer of proof of the attending physician, Dr. J. A. Johnson.

3. The action of the trial judge, relative to the request of the jury to have the testimony of Mrs. Barnes read.

4. Exception to that portion of the charge of the court relating to the disposition a testator or testatrix can make of his or her property, under the laws of this state.

5. The admission of testimony of nonexperts as to deceased's competency.

No claim is made in this court that the evidence is insufficient to justify the verdict. We will consider these questions in the order named.

A careful examination of the testimony in regard to undue influence upon the deceased convinces us that the trial court was right in refusing to submit that question to the jury, as there is not a scintilla

of evidence that Cathro, Dana, or any other person exercised any undue influence over testatrix regarding the said will.

Section 7304, Rev. Codes 1905, as far as material, reads as follows: "3. A physician or surgeon cannot, without the consent of his patient, be examined as to any information acquired in attending the patient, which was necessary to enable him to prescribe or act for the patient."

Robert Auld, having been appointed special administrator of the estate of the said Mary Auld, deceased, made the following offer: "The counsel for the contestants in open court and of record, acting in behalf of the personal representative of Mary Auld, deceased, and of the heirs at law of said Mary Auld, and with their consent and approval, do hereby waive any privilege that may have existed arising out of the relations of physician and patient between the deceased, Mary Auld, and Dr. Johnson, and offer to show and prove by the said Dr. Johnson the following facts, and by separate offers hereunder:

1. "That on the night of March 18th, 1905, upon the occasion of his visit to her residence, and in the presence of J. J. Weeks and others, and at the time the alleged will was made, did take the temperature of the said Mary Auld; that her temperature was 103$\frac{2}{5}$."

2. "Counsel further offers to show by the testimony of Dr. Johnson that he made examination of Mary Auld on the occasion above stated and that she was then seriously affected with toxemia."

3. "Counsel further offers to show by the testimony of this witness that the effects of toxemia upon the human system to the extent the said Mary Auld was then afflicted is to produce mental and physical stupor and torpor, and render a person so affected and afflicted incapable of coherent thinking and of imperfect memory and impaired reasoning power; and that upon the occasion in question the said Mary Auld was thus afflicted and affected."

4. "Counsel further offers to show by this witness that upon the night of the 18th of March, 1905, when the alleged will is said to have been executed, the said Mary Auld was not in possession or control of such mental faculties as she ordinarily possessed, and was wholly unable to reason or think consecutively, or exercise the power of memory."

5. "Counsel further offers to show by the witness Dr. Johnson that

he visited Mary Auld during her lifetime, observed her upon the following occasions,—his calls and visit upon her and her calls on him varying in length from fifteen minutes to twenty minutes,— October 31, 1904; February 16, 1905; February 22, 1905; March 3d, 1905; 9th, 11th, 15th, 16th, 18th of. March, three visits on the 20th of March, and one visit each on the 21st and 24th of March, 1905.

"That from the observations made upon the occasions above stated the said Mary Auld, in his opinion, was not of sound mind."

To which offer the following objection was made: Respondents and proponents object to said testimony upon the grounds and for the reason that it appears that all proofs therein outlined consists of information derived by the witness from an examination made by him while acting as the physician of the deceased testatrix, and there has been no consent shown with respect to his testifying thereto, and by reason thereof the communication is privileged, and must be excluded under the provisions of § 7304 of the 1905 Code, which objection was sustained.

Appellants contend that the rejection of the offer of proof of the attending physician was error. While this question has not heretofore been passed upon by this court, and while some courts, notably Minnesota, Iowa, and Missouri, have held, under certain, circumstances, that such testimony was admissible under statutes somewhat similar to ours, we, however, think the better rule sustains the ruling of the learned trial court.

New York, Wisconsin, California, Utah, and other states hold such evidence inadmissible, holding that the privilege is personal with the patient, that it applies in testamentary matters, and cannot be waived by the heirs and personal representatives. Grattan v. Metropolitan L. Ins. Co. 80 N. Y. 296, 36 Am. Rep. 617; Westover v. Ætna L. Ins. Co. 99 N. Y. 56, 52 Am. Rep. 1, 1 N. E. 104; Renihan v. Dennin, 103 N. Y. 573, 57 Am. Rep. 770, 9 N. E. 320; Loder v. Whelpley, 111 N. Y. 239, 18 N. E. 874; Re Coleman, 111 N. Y. 220, 19 N. E. 71; Re Myer, 184 N. Y. 54, 76 N. E. 920, 6 A. & E. Ann. Cas. 26; Boyle v. Northwestern Mut. Relief Asso. 95 Wis. 312, 70 N. W. 351; Re Hunt, 122 Wis. 460, 100 N. W. 874; Re Van Alstine, 26 Utah, 193, 72 Pac. 943; Connecticut Mut. L. Ins. Co. v. Union

Trust Co. 112 U. S. 250, 28 L. ed. 708, 5 Sup. Ct. Rep. 119; Supreme Lodge K. P. v. Meyer, 198 U. S. 508, 49 L. ed. 1146, 25 Sup. Ct. Rep. 754; Re Flint, 100 Cal. 391, 34 Pac. 863; Harrison v. Sutter Street R. Co. 116 Cal. 156, 47 Pac. 1019; Re Redfield, 116 Cal. 637, 48 Pac. 794; Re Nelson, 132 Cal. 182, 64 Pac. 294; Re Bruendl, 102 Wis. 45, 78 N. W. 169.

Section 834 of the Code of New York is as follows: "A person duly authorized to practise physic or surgery shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity."

Section 836 provides that that section applies to every examination of a person as a witness, unless the provisions thereof are expressly waived by the patient.

These sections have been construed by the New York court several times.

In Westover v. Ætna L. Ins. Co. 99 N. Y. 56, 52 Am. Rep. 1, 1 N. E. 104, the court says: "The purpose of the laws would be thwarted, and the policy intended to be promoted thereby would be defeated, if death removed the seal of secrecy from the communications and disclosures which a patient should make to his physician, or a client to his attorney, or a penitent to his priest. Whenever the evidence comes within the purview of the statutes, it is absolutely prohibited, and may be objected to by anyone, unless it be waived by the person for whose benefit and protection the statutes were enacted. After one has gone to his grave, the living are not permitted to impair his fame and disgrace his memory by dragging to the light communications and disclosures made under the seal of the statutes. An executor or administrator does not represent the deceased for the purpose of making such a waiver. He represents him simply in reference to rights of property, and not in reference to those rights which pertain to the person and character of the testator."

In Renihan v. Dennin, 103 N. Y. 573, 57 Am. Rep. 770, 9 N. E. 320, the court says: "But it is claimed that the statute should be held not to apply to testamentary cases. There is just as much reason for applying it to such cases as to any other, and the broad and sweeping language of the two sections cannot be so limited as to exclude

such cases from their operation. There is no more reason for allowing the secret ailments of a patient to be brought to light in a contest over his will, than there is for exposing them in any other case where they become the legitimate subject of inquiry. An exception so important, if proper, should be ingrafted upon the statute by the legislature and not by the courts."

In Re Myer, 184 N. Y. 54, 76 N. E. 920, 6 A. & E. Ann. Cas. 26, the court says: "The petitioners introduced testimony tending to show that, at the time of the execution of the will, the testatrix was afflicted with paresis, which it was claimed deprived her of testamentary capacity. In order to supplement and support this evidence, the petitioners called two physicians,—Drs. Carlton and Townsend. The former had been the medical adviser of the testatrix's brother, and the latter of her mother. These witnesses testified that both the mother and brother of testatrix had been afflicted with what they termed 'general paresis,' that their knowledge of this condition was obtained while attending such persons in their professional capacity, and that such knowledge was necessary in order to treat them. The testimony was objected to as incompetent and privileged under § 834 of the Code of Civil Procedure, and the ruling admitting it was properly excepted to because it was inadmissible, upon two grounds: .

"1. It is clearly within the provisions of § 834, which prohibits a physician from disclosing 'any information which he acquired in attending a patient, in a professional capacity, and which was necessary to enable him to act in that capacity.' . . .

"By the express terms of § 836 the provisions of § 834 are made to apply to the 'examination of any person as a witness.' The fact that the testimony of these physicians related to patients who were not parties to the proceeding or interested therein, and who were, in fact, dead at that time, does not annul the prohibition of the statute. In Davis v. Supreme Lodge, K. H. 165 N. Y. 159, 58 N. E. 891, the defense sought to prove the cause of death of two aunts of the deceased, by the testimony of their attending physicians. The evidence was excluded, and this court upheld the ruling. Judge O'Brien, in writing for the court, said (page 163): 'This court has held that the statements of the attending physician for the purpose of establishing the cause of death either of the insured himself or of his an-

cestors or their descendants, although not parties to nor beneficiaries under the contract, were not admissible. They are excluded, not only for the purpose of protecting parties from the disclosure of information imparted in the confidence that must necessarily exist between the physician and patient, but on grounds of public policy as well. The disclosure by a physician, whether voluntary or involuntary, of the secrets acquired by him while attending upon a patient in his professional capacity, naturally shocks our sense of decency and propriety, and this is one reason why the law forbids it.' "

In Re Flint, 100 Cal. 391, 34 Pac. 863, the supreme court of California says: "The question of waiver of the privilege by the personal representative or heir of the deceased is a new one in this state, but the statute of New York bearing upon this matter is similar to the provision of our Code of Civil Procedure, and the decisions of the courts of that state furnish us ample light in the form of precedent. The Code of Civil Procedure of New York (§ 836) provides that the privilege is present unless 'expressly waived by the patient.' "

The court further says: "Who has the power to waive it? Can the heir waive it as against the objection of the devisee? That is the thing done in this case, and we think the action of the court cannot be sustained. It cannot be said that the heir is representing the deceased, for the heir is attempting to overthrow the will, and offers this evidence of the attending physician, over which the privilege rests for the very purpose of attacking the mental soundness of the patient. Such is not the representative of the deceased referred to in the various decisions of the courts. This provision of law rests upon a sound public policy."

In Boyle v. Northwestern Mut. Relief Asso. 95 Wis. 312, 70 N. W. 351, the court says: "The question as to the admissibility of the evidence of the physicians, against the objection of the beneficiaries of the certificate, claiming under Mrs. Boyle, the deceased, is not one free from difficulty. There can be no question but that the information they severally acquired, and which enabled them to give their testimony, was acquired in attending Mrs. Boyle as a patient, and that it was necessary to enable them to advise her and to prescribe for her as physicians. Was this information privileged, as to her, under Rev. Stat. § 4075, which provides that 'no person duly author-

ized to practise physic or surgery shall be compelled to disclose any information which he may have acquired in attending any patient in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or to do any act for him as a surgeon.' By the common law, information thus obtained by a physician or surgeon was not privileged, but he was at liberty to disclose it, either in or out of court, whatever effect such disclosure would have upon the rights, reputation, or feelings of his patient. The contention in favor of the admissibility of the evidence is that the use of the word 'compelled' in the section shows that the information thus acquired is not privileged from disclosure as to the patient, whom such a disclosure may most seriously affect, but is privileged only as to the physician or surgeon, and that he may, at his option, disclose it in court, when all the injurious details may be publicly elicited under oath, or he may refuse to do so, in which event only the information is to be privileged, so that its disclosure will not be 'compelled.' . . . The statute relates only to his giving testimony in court in relation to information thus acquired, and it should receive, we think, a liberal interpretation, in order to carry out its evident beneficial purposes. It provides that the physician shall not be compelled to disclose any information, etc., acquired in his confidential relations with his patient. For whose benefit was this provision intended? Clearly, for the benefit of the patient, whose interests, reputation, and sensibilities may be injured and grossly outraged by its disclosure. The fact that the physician acquired the information in order to prescribe for or treat the patient cannot affect the physician in the least degree unfavorably, nor that he should be compelled to disclose as a witness the information or knowledge thus acquired. The object of the section, therefore, was to protect the patient, to whom protection was so important, and not the physician, to whom it was quite unimportant, from the consequences of such disclosure, and shows that the provision that the physician shall not be compelled to make the disclosure as a witness renders the statement of the patient privileged as to him, and that this was within the intention of the makers of the statute clearly implied from its language, and that it should not be disclosed by the physician without his consent."

In Re Hunt, 122 Wis. 460, 100 N. W. 874, the court says: "2. Ex-
clusion of attending physician's testimony and opinion as to mental
competency, based entirely upon information derived from decedent's
statements or physician's observation while treating her professionally
and for the purpose of such treatment. Our decisions upon the stat-
ute (§ 4075, [Rev.] Stat. [Wis.] 1898) giving privilege of secrecy
to all information acquired by physician from patient in attending
latter professionally, necessary to enable prescription for such patient,
have eliminated from consideration very many of the refinements
and distinctions with which some other courts have limited, if not
emasculated, similar statutes. Thus the privilege under our statute
is not confined to communications made by the patient, but extends
to all information, however derived by the physician in the course
of professional attendance and for the purpose specified. McGowan
v. Supreme Court, I. O. F. 104 Wis. 173, 186, 80 N. W. 603; Green
v. Nebagamain, 113 Wis. 508, 512, 89 N. W. 520; Re Downing, 118
Wis. 581, 590, 95 N. W. 876. Neither are the words 'necessary' or
'prescribe' to receive any technical or unduly restricted meaning. Re
Bruendl, 102 Wis. 45, 47, 78 N. W. 169. Further, and more im-
portant to the present controversy, we have held that the privilege is
created for the protection of the patient, and is personal to him; and
have in the plainest terms repudiated the doctrine supported by some
authority elsewhere, that others can in any degree waive the privi-
lege. In Boyle v. Northwestern Mut. Relief Asso. 95 Wis. 312,
70 N. W. 351, this construction was announced, although its appli-
cation was merely to deny right of waiver to physician. In Re Bruendl,
supra, right of waiver was contended for in behalf of the heirs of the·
decedent, who offered the physician's testimony, and the whole sub-
ject was argued and considered fully, whereupon it was said: 'The
legislature has decided wisely that public policy requires such meas-
ure of restriction upon the freedom of the physician to testify or of
others to demand testimony.' While the decision in this case turned
on other considerations, the above remark was made with delibera-
tion, and in response to full discussion. We adhere to that view,
and hold that no one, save the patient himself, can effectively con-
sent to withdrawal of this mantle of secrecy which the statute has

cast about the information which the physician needfully acquired in and for professional treatment.

"Appellant contends further, however, that the statute has no application to a contest over the probate of a will, and cites quite an array of cases where courts have, on one theory or another, reached substantially that conclusion. While most of these cases relate to the testimony of attorneys as to the very transaction of preparing the will, a few of them either deal directly with physicians, or admit evidence of attorneys on grounds seemingly applicable to physicians. The great majority of these proceed on the ground that the right to waive the privilege, personal to the testator while living, passes on his death to those who succeed to his estate. This doctrine grew up in dealing with communications to attorneys with reference to property, where, as said, the privilege was accorded as a protection merely to property interests; so that there was a measure of logic in the conclusion that those who succeed to the property rights succeeded also to the right of secrecy, and might waive it, at least so far as it affected their own interests. This view has never yet been approved even as to attorneys in Wisconsin, where such evidence, whenever admitted, has been justified on other grounds, as we shall see. As to physicians, however, the attitude of this court, as already pointed out, is adverse to any power to waive the secrecy of professional information, and is also adverse to the grounds asserted by other courts, notably Iowa (Winters v. Winters, 102 Iowa, 53, 63 Am. St. Rep. 438, 71 N. W. 184), viz., that the 'statutes are for the protection of the patient while living, and of his estate when dead.' Whether this last idea may be correct as to communications to attorneys with reference to property transactions, it certainly is not true with reference to the sheltering of information acquired by attending physicians. The purpose of that statute is personal. It is to protect the patient himself from disgrace or chagrin. Its effect on property rights or estate is only incidental. Boyle v. Northwestern Mut. Relief Asso. 95 Wis. 322, 70 N. W. 351; Green v. Nebagamain, 113 Wis. 508, 89 N. W. 520; Re Bruendl, 102 Wis. 45, 47, 78 N. W. 169. Such reasons do not cease upon the death of the patient. His memory and good name are still subject to injury by publication of information necessary to proper treatment by his physician, and apprehension of

such enforced publication after his death may well result in reluctance or unwillingness to make those disclosures necessary for preservation of life or health which it is the policy of the statute to encourage by assurance of their secrecy."

In Fraser v. Jennison,—a will contest,—42 Mich. 206, 3 N. W. 882, the trial court permitted the physician who attended the testator to testify as to his condition. The supreme court sustained the ruling, holding that the statute is one of privilege for the protection of the patient, and he may waive it if he sees fit, and what he may do in his lifetime, those who represent him after his death may also do for the protection of the interests they claim under him.

In later cases, the same court held that no one but the patient himself could waive the privilege. Maynard v. Vinton, 59 Mich. 139, 60 Am. Rep. 276, 26 N. W. 401; Derham v. Derham, 125 Mich. 109, 83 N. W. 1005; Storrs v. Scougale, 48 Mich. 387, 12 N. W. 502.

In Storrs v. Scougale, supra, the court, in speaking of the evidence of a physician, says: "This evidence ought not to be passed over without remark. It is surprising evidence for many reasons. One of these is that the physician had no business to give it. The statute —Comp. Laws, § 5943—provides that 'no person duly authorized to practise physic and surgery shall be allowed to disclose any information which he may have acquired in attending any patient, in his professional character, and which information was necessary to enable him to prescribe for such patient as a physician, or do any act for him as a surgeon.' Every reputable physician must know of the existence of this statute; and he must know, from its very terms as well as from the obvious reasons underlying it, that it is not at his option to disclose professional secrets. A rule is prescribed which he is not to be 'allowed' to violate; a privilege is guarded which does not belong to him but to his patient, and which continues indefinitely, and can be waived by no one but the patient himself."

In Indiana it is held that only one seeking to uphold the will may waive the privilege, and not one seeking to break it. Towles v. McCurdy, 163 Ind. 12, 71 N. E. 129; Morris v. Morris, 119 Ind. 341, 21 N. E. 918; Heuston v. Simpson, 115 Ind. 62, 7 Am. St. Rep. 409, 17 N. E. 261; Brackney v. Fogle, 156 Ind. 535, 60 N. E. 303.

In Towles v. McCurdy, supra, the court says: "When the contro-

versy is among heirs and devisees, the set of such heirs or devisees who strive to overthrow the will cannot for their own benefit, and against the wishes of the other set, who desire to sustain it, waive the objection to evidence, otherwise incompetent, to the detriment of the interests of those who seek to establish the will."

The jury retired about 3 o'clock P. M. on the 10th day of August. The same afternoon the Honorable C. F. Templeton, the judge before whom the said action was being tried, left the city of Bottineau, at which place the jury was, and went to Lake Metigoshe, about 12 or 13 miles distant from the city of Bottineau, and did not return to Bottineau until about 10 A. M. of the morning of August 12th.

That about 10:30 P. M. on said 10th day of August, the jury requested, through the bailiff, that the testimony of Mrs. E. E. Barnes, a witness in said action for contestants, be read to the jury, and the bailiff reported back to the jury that he had not been able to reach the judge.

At about 8 o'clock in the morning of August 11th, the jury had not arrived at a verdict, and another request was sent by the jury through the bailiff, for the said testimony, and the said trial judge informed the jury that the testimony requested would be furnished at the opening of court at 10 o'clock A. M. on the morning of August 12th, August 11th being Sunday.

That the jury arrived at a verdict at about 5 o'clock P. M. on the 11th day of August, without having read to them the portion of Mrs. Barnes's testimony they desired to hear before arriving at a verdict.

The action of the trial judge relative to the requests of the jury to have the testimony of Mrs. Barnes read, appellants assign as error, and strenuously contend that such action of the trial judge tended to force the jury to arrive at a verdict. Appellants rely principally upon three cases: State v. Place, 20 S. D. 489, 107 N. W. 829, 11 A. & E. Ann. Cas. 1129; Henderson v. Reynolds, 84 Ga. 159, 7 L.R.A. 327, 10 S. E. 734; Pierce v. Pierce, 38 Mich. 412. None of these cases are in point.

In State v. Place, supra, after the case was submitted, the jury retired to consider the case at 9 o'clock P. M. on June 21, 1905, and after being out all night and all the next forenoon, without having agreed upon a verdict, they were brought into court and asked by the

court if they had agreed upon a verdict, to which they replied that they had not. The court thereupon asked, "What seems to be the matter?" To which the foreman replied, "We are shy on evidence." The court thereupon replied that he could not help them out any on the evidence, if it were matters of law he could give them further instructions. "But," said he, "you will have to agree in this case, for I will keep you together until you do agree." Defendant's counsel thereupon excepted to the court's statement to the jury that he would keep the jury together until they did agree, and to this the court replied in substance: "You may have an exception, but I will keep this jury together until they do agree upon a verdict." All of the foregoing took place in the presence and hearing of the jury. The court thereupon directed the jury to retire with the officer, at the time of taking the noon recess, which they did, and when the court reconvened after recess, at 1:30 P. M. on June 22d, the jury was brought into court, and asked by the court if they had agreed upon a verdict, to which they replied that they had, whereupon the court asked them what their verdict was, and the foreman replied: "We, the jury, find the defendant guilty as charged in the information." The jury was then polled and each answered that that was his verdict. This verdict was set aside, the court saying: "In this enlightened age no one will contend that a verdict should stand which does not, at least presumptively, express the free and deliberate judgment of those who rendered it."

In the case of Henderson v. Reynolds, supra, the jury retired at about half past 8 on Saturday night. Some time before 12 o'clock the judge sent the sheriff to inquire of the jury if they were likely to agree. The sheriff reported that the jury told him that they were not. About half an hour after, the court ordered the jury brought in, and told them it was nearly 12 o'clock, and that, the next day being Sunday, they would have to cease their deliberations until after midnight of the next day; that during that time they were not to discuss the verdict, or anything connected with the case; that they would have to keep together during the entire day and night; that the sheriff would provide a place for them to sleep together; and that they would be furnished their meals, but that it would be at their

own expense. The jury were then sent back to their room, and in a few minutes returned with a verdict.

In setting the verdict aside, the court said: " 'The old idea of starving juries, to coerce a verdict, has passed away, and the judge is empowered to furnish refreshments at the expense of the county.'

"We are not surprised that this jury should agree so quickly after being instructed by the judge that they would be kept together for more than twenty-four hours longer and at their own expense. It may have been that the very jurors who were holding out against the proposed verdict were unable to pay for their meals, and therefore agreed to the verdict, rather than go without food until the court should meet again, the next Monday morning."

In Pierce v. Pierce, which was a will contest, the case was submitted to the jury on Tuesday afternoon. On Wednesday afternoon the officer in charge was requested to inform the judge that they could not agree. Thereupon the judge directed the officer to tell them: "The judge does not believe it yet, and you might say to them that it is essential they agree to-night, as I am going away, and won't be back until day after to-morrow, and they might not get discharged until I come back, as Judge Coolidge is going to be here." The verdict was returned within an hour thereafter. The court says: "We cannot but think the tendency of the message was to drive the jury into action which might not have been taken otherwise. . . . Jury trials can never be safe unless the verdict is made as far as possible the unbiased and free conclusion of every juror. Every attempt to drive men into an agreement which they would not have reached freely is a perversion of justice. It may be discretionary with the trial judge to keep a jury out until he is satisfied an honest and free agreement is not to be expected. But there is no legal propriety in keeping a jury confined unreasonably. After they have come to an agreement, and a verdict obtained by the suggestion of such an alternative it is a verdict obtained by what it would be hard to distinguish from duress. It may be that the court is not bound to be present continually on the chances of an agreement; but any unusual and prolonged delay is not to be favored without giving an opportunity to find a sealed verdict."

There was no coercion in the case at bar. The jury were at liberty

to and did return a sealed verdict. The first request made by the jury to have the testimony of Mrs. Barnes read was made about 10:30 P. M. Saturday night. The next request was made about 8 o'clock on Sunday morning. The judge then sent word to the jury that the testimony requested would be read at the opening of court on Monday morning. The jury, without waiting to have the testimony read, agreed upon a verdict at 5 o'clock in the afternoon of Sunday. The judge was not obliged to remain close to the jury during all their deliberations.

Section 6750, Rev. Codes 1905, as far as material, is as follows: "Courts shall not be open on Sundays or legal holidays, unless for the purpose of instructing or discharging a jury, or receiving a verdict." The court was not obliged to have the testimony read to the jury on Sunday, even had he been in Bottineau, and he was not obliged to remain for the purpose of receiving a verdict, as the jury were allowed to return a sealed verdict, which they did.

Section 7027, Rev. Codes 1905, is as follows: "After the jury have retired for deliberation, if there is a disagreement between them as to any part of the testimony, or if they desire to be informed of any point of law arising in the case, they may require the officer to conduct them into court. Upon their being brought into court the information required must be given in the presence of or after notice to the parties or counsel."

Appellants insist that the failure to have the testimony of Mrs. Barnes read to the jury necessitates a reversal of the case. Assuming, without deciding, that the jury were entitled to have the stenographer's minutes of the testimony of Mrs. Barnes read, we cannot agree with appellants that the failure to have it read necessitates a reversal of the case. The learned trial court did not refuse the request of the jury, but sent word to them that the testimony would be read at the opening of the court on Monday morning. The jury, without waiting for the testimony to be read, returned a verdict.

In Moore v. State, 52 Tex. Crim. Rep. 364, 107 S. W. 355, which was a prosecution for burglary, the jury made a request to have read to them by the official stenographer a part of the testimony of the witnesses as to the location of the house alleged to have been entered, and as to how high the moon was. The court says: "It appears from the

record that this request was made to the court at night, and that in response thereto, after some inquiry had been made, the court advised the jury that the stenographer had gone home, but that as soon as he could get him he would have the testimony read to them as requested. A short time after this, and without additional or further request from the jury, a verdict of guilty was returned. It was, of course, clearly the right of the jury to have the testimony requested read to them; but where, as in this case, they returned a verdict without pressing further their request, it must be assumed that it was no longer desirable or necessary, to have their memories refreshed by having the testimony read to them. We do not, therefore, believe there was any error in this action of the court."

In People v. Warren, 130 Cal. 678, 63 Pac. 87, which was a prosecution for grand larceny, the case was submitted to the jury about eight o'clock P. M. After 11 o'clock P. M. the jury came into court and asked to have the testimony of defendant read to them. The reporter informed the judge that it would take about two hours to read the testimony. The judge then announced to the jury that, owing to the lateness of the hour, it would be necessary to adjourn until the next day at 9 o'clock A. M., when the testimony would be read. A few minutes before 9 o'clock the next morning the jury came into court and announced that they had agreed upon a verdict. Counsel then objected to the verdict being received, because the testimony called for by the jury had not been read. This objection was overruled, and such ruling was sustained on appeal.

Appellants cite, in support of their contentions that it was reversible error not to have the testimony of Mrs. Barnes read to the jury, the following cases: State v. Perkins, 143 Iowa, 55, 21 L.R.A.(N.S.) 931, 120 N. W. 62; Roberts v. Atlanta Consol. Street R. Co. 104 Ga. 805, 30 S. E. 966; State v. Manning, 75 Vt. 185, 54 Atl. 181; People v. Shuler, 136 Mich. 161, 98 N. W. 986; Drew v. Andrews, 8 Hun, 23; Moore v. State, 52 Tex. Crim. Rep. 364, 107 S. W. 355; Alexander v. Gardner, 14 R. I. 15; Slack v. Stephens, 19 Colo. App. 538, 76 Pac. 741; Merritt v. New York, N. H. & H. R. Co. 164 Mass. 440, 41 N. E. 667; Freezer v. Sweeney, 8 Mont. 508, 21 Pac. 20, 17 Mor. Min. Rep. 179; State v. Hunt, 112 Iowa, 509, 84 N. W. 525; Cannon v. Griffith, 3 Kan. App. 506, 43 Pac. 829.

We have carefully examined these cases, and find that they are not in point, and that most of them only go to the extent of holding that it is not error in the trial court, at the request of the jury, to direct the stenographer to read from his notes the testimony of the witnesses on a material issue in the case.

The cases of State v. Manning, 75 Vt. 185, 54 Atl. 181, and People v. Shuler, 136 Mich. 161, 98 N. W. 986, hold that it is in the discretion of the trial court to grant or deny a request of the jury to have certain evidence read.

In Drew v. Andrews, 8 Hun, 23, which was a civil action, after the case went to the jury and they had deliberated for about two hours, they requested of the court information as to what a witness for the defendant had testified in reference to a portion of the work claimed for. The counsel for the defendant, in the presence of plaintiff's counsel, asked the court to bring in the jury and state the evidence to them, as requested. The court refused. A short time after, the jury returned into court, and said they had agreed on a verdict for plaintiff. The appellate court held it was error for the trial court to refuse the request of the counsel for the defendant, made in the presence of plaintiff's counsel, to bring in the jury and state the evidence to them as requested. This case has no bearing on the case at bar, as in the case at bar the trial court sent word to the jury that he would have the requested testimony read to them on Monday morning, but the jury, without waiting to have such testimony read, returned a verdict.

Appellants assign as error the following portion of the court's charge: "The law of this state provides that every person of sound mind, being eighteen years of age or more, whether married or single, has a right to make disposition of his or her estate by will, and so distribute his or her estate as to devest those who would otherwise inherit it as his or her legal heirs, of their interest herein. Indeed the object of the law in permitting a person to make a will is to enable a testator or testatrix to divide and distribute his or her property as to him or her may seem best; and no next of kin or relative, no matter how near they may be, can be said to have any legal or natural right to the estate of the testator or testatrix which can be asserted against the legally executed will of the latter. The law in this state has placed the estate of persons over the age of eighteen years wholly under the

control of the owner, and to be divided or distributed by the latter as he or she may freely choose and direct in the last will and testament made by him or her. Neither husband, mother, sister, nor brother have any natural right to the estate of the deceased wife, daughter, or sister which can be exerted against any disposition of said estate which said wife, daughter, or sister, if of sound mind, may choose to make by will," saying that it was unnecessarily charging as to the legal naked right to dispose of property by will without stating that an unnatural disposition might be considered as evidence tending to establish mental incapacity or undue influence." As stated before, there was no evidence of any undue influence. We think the court stated the law correctly, and there was no error in the charge.

The last assignment of error argued is as to the admission of testimony of nonexpert witnesses as to the mental soundness of the deceased, over the objection of appellants on the ground of an insufficient foundation.

The rule is that a nonexpert will be allowed to express an opinion upon an issue of sanity only after he has testified to acts, conversation, or conduct which to some extent indicate sanity.

In this class of cases the question of the competency of the witness to testify is one for the court, and is also a question lying within the sphere of judicial discretion; and the familiar rule that such discretion will not be reversed except in cases of abuse applies in the case of nonexperts as well as experts who are called to express opinions upon an issue of insanity. State v. Barry, 11 N. D. 428, 92 N. W. 809; Denning v. Butcher, 91 Iowa, 425, 59 N. W. 69; Re Hull, 117 Iowa, 738, 89 N. W. 979; Atkins v. State, 119 Tenn. 458, 13 L.R.A. (N.S.) 1031, 105 S. W. 353; Ryder v. State, 100 Ga. 528, 38 L.R.A. 721, 62 Am. St. Rep. 334, 28 S. E. 246.

In Denning v. Butcher, supra, the court says: "The right of a nonexpert witness to give an opinion based upon facts fully disclosed to the jury has always been recognized, but it is equally clear that the court has the right to determine whether such facts have been disclosed as to entitle the witness to express an opinion." See also 3 Wigmore, Ev. §§ 1917 etc.; See also note in Ryder v. State, supra.

It follows, from what we have said, that the court did not err in denying appellant's motion for a new trial.

The order appealed from is affirmed.

ELLSWORTH, J. (Dissenting.) I am unable to agree in the holding of my associates that the trial court was justified as a matter of law in instructing the jury that there was not sufficient evidence to establish that the alleged will in controversy was executed as the result of undue influence practised upon the said Mary Auld. The testimony shows quite conclusively, I think, that at the time of the execution of the will, Mrs. Auld was at the point of death and in a mental condition closely bordering on entire incompetency. In such a condition as this the mind of the testator was peculiarly susceptible to the influence of a stronger will. An influence that at other times might be without effect, in this condition of mind and body might have been regarded by the jury as "undue." I believe that all the circumstances attending the subscription of the will by the testator should have been submitted to the jury under a proper instruction. Neither the trial court nor this court could usurp the function of the jury to the extent of saying that it might not have found upon a consideration of these facts that undue influence was exercised; and if it had so found, I believe there was sufficient competent evidence to sustain a holding of that kind.

I am of the opinion, therefore, that for error in this particular, the judgment should be reversed and a new trial granted.